IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

ANGELA SUE HENDERSON,  }
                      }
    Plaintiff          }
                      }       CIVIL ACTION NO.
    vs.               }
                      }       CV-97-AR-1925-E
J. & R. INDUSTRIES, INC., }
HUDDLE HOUSE, INC., JAMES }
EARL KING. SR.,       }
                      }
    Defendants

FILED 98 JUL 21 AM 9:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
JUL 21 1998

## MEMORANDUM OPINION

Presently before the court is a motion for summary judgment filed by defendant and cross-claimant, Huddle House, Inc. ("Huddle House"). Plaintiff, Angela Sue Henderson ("Henderson"), is suing Huddle House, along with J & R Industries ("J & R") and its owner James Earl King, Sr., ("King") who operates the Huddle House franchise here involved. Plaintiff makes claims of sexual harassment, 42 U.S.C. § 2000e, *et seq.*, the Alabama torts of outrage and invasion of privacy against both J & R and King, and a negligent supervision claim against Huddle House. Huddle House cross-claims against both J & R and King for breach of their franchise agreement. The court finds that Huddle House's motion for summary judgment should be denied in all of its aspects.

### I. SUMMARY JUDGMENT STANDARD

Under F.R.Civ.P. 56(c), summary judgment is appropriate where "there is no genuine issue as to any material fact and ...

the moving party is entitled to a judgment as a matter of law."

## II. FACTS

Huddle House contends that it cannot be liable to Henderson under a theory of negligent supervision because it was not the alleged perpetrator's employer and no principal-agent relationship existed between it and King.[1] In support of this contention, Huddle House cites to the franchise agreement which provides that the franchisee is solely responsible for its labor and employment practices. (Mot. For Summ. J., Def.'s Ex. B at last pg.) The agreement also provides that Huddle House has "no control or liability concerning decisions related to the hiring, promotion, discipline, termination, amount of wages, benefits or scheduling of the employees in [the] franchised restaurant." *Id*.

In addition to the franchise agreement, Huddle House directs the court to language found in the Huddle House Employee Handbook. (Pl.'s Ex. H at pg. 58.) Huddle House offers this handbook to any franchisee who would like to purchase the document rather than drafting its own handbook. It contains the

---

[1] For the remainder of this opinion, the court will refer to J & R and King collectively as "King," unless otherwise necessary for the sake of clarity.

2

following language:

> This location is not owned by Huddle House, Inc..... The franchiser, Huddle House, Inc., assumes no responsibilities or liability for the lack of adherence to and/or improper interpretation of any of the policies and procedures on the part of the company or its employees. If you have any questions about employment, do not contact Huddle House, Inc., as Huddle House, Inc., is not your employer and has no control over the labor relations and employment practices of the company.

(Def.'s Ex. C at pg. 56.) Finally, a Huddle House representative has testified, by deposition, that the company had no authority to direct the day-to-day operations of the franchise. (Def.'s Ex. C at pp. 11 - 16, 54.) Rather, Huddle House performed periodic inspections and evaluations, as advisory tools, in an effort to maintain consistency at each franchise location. (Def.'s Ex. C. at pp. 13 - 14.) These facts, Huddle House argues, show that it was not the alleged perpetrator's employer, nor did an agency-principal relationship exist between it and King.

In response, Henderson argues that an agency relationship existed between Huddle House and King because Huddle House exercised "extensive oversight and control" over the franchise. Henderson first points out that Huddle House maintained the ability to impose upon the franchisee "rules, regulations, policies and standards." (Pl.'s Ex. E. at pg. 9, ¶ f.) The

3

franchisee agreed to operate the business "in conformity with such methods, standards and specifications" as Huddle House prescribed. *Id.* at pg. 12, ¶ p. In addition, the franchisee agreed to allow Huddle House representatives to inspect and evaluate the franchise location and records. *Id.* at pg. 38, ¶ a. These evaluations covered all aspects of the operation from employee appearance, to "coffee handling," "restroom supplies" and "cooking speed." (Pl.'s Ex. G.) Termination of the franchise agreement was the sanction for repeated poor evaluations, failing to correct hazardous conditions, or failing to comply with "any law or regulation applicable to the operation" of the franchise. (Pl.'s Ex. E at pg. 30, ¶ xi; Def's Ex. C at pp. 15 - 16.)

According to Henderson, other indices of control included Huddle House's provision of training and, in emergencies, temporary employees for the franchisee. (Pl.'s Ex. H at pg. 42 - 43.) Finally, Huddle House provided the franchisee with a copy of the sexual harassment policy that Huddle House provides to its own employees. (Def.'s Ex. C at pg. 22.) Any violations of this policy could result in termination of the franchise agreement. (Pl.'s Ex. H at pg. 25.) This level of control shows that Huddle House and King were principal and agent, argues Henderson.

4

### III. AGENCY PRINCIPALS

Under Alabama[2] law, Huddle House may be liable for the tortious acts of King if Henderson can show that the two entities enjoyed a principal-agent relationship. *See Carlton v. Alabama Dairy Queen, Inc.*, 529 So. 2d 921, 923 (Ala. 1988).

> However, when a defendant's liability is based on agency, agency may not be presumed; evidence of agency must be presented in response to a defendant's properly supported summary judgment motion, in order for the motion to be defeated....
>
> The test to be applied in determining the existence of an agency relationship under the doctrine of respondeat superior is whether the alleged principal has control over the manner of the alleged agent's performance. However, the right to determine if an alleged agent is conforming to the requirements of a contract does not, in itself, establish control.... <u>There must exist some control of, or right to control, the methods or details of doing the work</u>.

*Id.* at 923 - 24 (emphasis suppled and citations omitted). *See also Wood v. Shell Oil Co.*, 495 So. 2d 1034, 1036 - 37 (Ala. 1986). In other words, liability attaches where the franchisor exercises sufficient control over the franchisee's day-to-day operations. *See Malmberg v. American Honda Motor Co. Inc.*, 644 So. 2d 888 (Ala. 1994). Finally, when determining whether an agency relationship exists, the court should not become persuaded by the manner in which "the parties characterize their

---

[2] Although Huddle House and King agreed to interpret the franchise agreement under Georgia law, (Def.'s Ex. B at pg. 39, ¶ a), the parties do not dispute that Alabama law applies to the agency analysis.

relationship, but by the facts of each case." *Land & Associates, Inc. v. Simmons*, 562 So. 2d 140, 144 (Ala. 1990) (citations omitted), *cert. denied General American Life Ins. Co. v. Simmons*, 499 U.S. 918, 111 S. Ct. 1305 (1991).

### IV. DID AN AGENCY RELATIONSHIP EXIST BETWEEN HUDDLE HOUSE AND KING?

After carefully reviewing the franchise agreement, the court determines that a genuine issue of material fact exists regarding the nature of the relationship between Huddle House and King. *See Dairy Queen*, 529 So. 2d at 923 ( noting that "[s]ummary judgment on the issue of agency is generally inappropriate, because this issue usually is a question to be determined by the trier of fact."). The franchise agreement is so broadly drawn that a reasonable person could find that Huddle House effectively controls many of King's day-to-day operations. *See Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 788 (3rd Cir. 1978); *Singleton v. International Dairy Queen, Inc.*, 332 A.2d 160, 163 (Super. Ct. Del. 1975).

The principally influencing language provides that the franchisee "shall at all times, conform strictly to the <u>method of preparation designated by the Company, including, without limitation, food preparation, cooking and serving, maintenance</u>

and cleaning procedures, bookkeeping methods and similar items."
(Def.'s Ex. B at pg. 11, ¶ k.) (emphasis supplied).  In addition,
the contract allows Huddle House to change the required
"techniques and methodologies relating to the preparation, sale,
promotion and marketing of food products and services."  Id. at
pp. 14 - 15, ¶ u.  These "techniques and methodologies" are found
in the franchise agreement, Huddle House's "Confidential
Operating Manual or in other written materials provided" by the
franchisor.  Id. at pg. 9, ¶ f.[3]  Other contract provisions
indicating that Huddle House may have exercised control over
King's day-to-day operations abound:

- The franchise is required to remain open for business twenty-four hours per day, seven days a week.  (Def.'s Ex. B at pg. 11, ¶ k.)

- The franchisee may not employ any managers who are involved in the operation of, or who own an interest in, another restaurant that serves breakfast at times other than six until eleven in the morning.  Id. at pg. 16, ¶ aa.  Upon becoming aware that a manager is involved in, or has an interest in, a prohibited restaurant, the franchisee must give the manager written notice to terminate the relationship with the other eating establishment within thirty days.  Id.  The franchisee must terminate the manager if the manager does not comply with such a notice.  Id.

- Huddle House, ("Company"), may direct the franchisee to make any repairs and replacements to fixtures, furnishings, signs and equipment.  Id. at pg. 13, ¶ q.  The franchisee must immediately correct any deficiencies detected during an inspection.  Id. at pg. 12, ¶ o.  During one such inspection

---

[3] Presently, only the franchise agreement is a part of the record in this case.

      Huddle House informed King that "shortening in the deep fryer needs changing," and that the "up-draft filters" should be cleaned "daily."  (Pl.'s Ex. G at pg. 1.)

- Unless the franchisee obtains prior written approval, he may not sell any product that is not found on the Company menu. (Def.'s Ex. B at pg. 11, ¶ k.)

- The franchisee may only use business stationary, business cards, marketing materials, advertising materials, printed materials or forms" which have been approved in advance by the Company.  *Id.* at pg. 11, ¶ l.  In addition, the franchisee cannot choose a representative in connection with local promotions, without prior approval of the company. *Id.*

- The franchisee must use "fixtures, furnishings, signs, equipment, inventory, uniforms, advertising materials, and other supplies products and materials ... solely from suppliers ...who have been approved ... by the Company.  *Id.* at pg. 10, ¶ i.  In order to use items from suppliers who are not pre-approved, the operator must submit a written request for approval.  *Id.*

- Franchise employees may wear only apparel which "strictly" conforms to the "specifications, design(s), color(s) and style(s) approved by the Company ...."  *Id.* at pg. 13, ¶ (q)(iii).

- After five years from the date of the franchise agreement, Huddle House has the right to require that the franchisee undertake "remodeling, repairs, replacements and redecoration in and upon the premises, and upon the equipment and furnishings ...," as determined by Huddle House, for the purpose of bringing the location up to new standards.  *Id.* at pg. 13, ¶ r.

- The franchisee must "install, update or replace any equipment (including cash registers) or software designed

8

for the purpose of recording receipts" and must "utilizes equipment including locked totaling devices and software of such king and in such manner as is reasonably specified by Company from time to time." *Id*. at pg. 14, ¶ s.

While some of these provisions clearly provide that King must maintain general standards, other provisions appear to "direct[] the manner of the work, offer[] advice ... or attempt[] to supervise the manner ..." in which King's employees performed their duties. *See Williams v. Tennessee River Pulp and Paper Co.*, 442 So. 2d 20, 22 (Ala. 1983). Such "continuous subjection to the will of the principal" is what "distinguishes the agency agreement from other agreements." *Murphy v. Holiday Inns, Inc.*, 219 S.E.2d 874 (Va. 1975)(cited with approval in *Dairy Queen*, 529 So. 2d at 924). Therefore, this court cannot, as a matter of law, find that no agency relationship existed between Huddle House and King.

Huddle House relies on several cases to support its contention that it does not maintain a principal-agent relationship with King. *See Bahadirli v. Domino's Pizza*, 873 F. Supp. 1528 (M.D. Ala. 1995); *Carlton v. Alabama Dairy Queen, Inc.*, 529 So. 2d 921 (Ala. 1988); *Wood v. Shell Oil Co.*, 495 So. 2d 1034 (Ala. 1986). However, these cases do not compel summary judgment in favor of Huddle House. In *Bahadirli v. Domino's*

9

*Pizza*, the plaintiff failed to present <u>any</u> evidence that might contradict Domino's claims that it did not control the day-to-day operations of the franchise. 873 F. Supp. at 1527. Obviously, such is not the case here.

The franchise agreement in *Carlton v. Dairy Queen* did not contain broad language upon which the defendant might justify control over the daily operations of the franchisee. 529 So. 2d 921. For the most part, Dairy Queen imposed very generalized requirements on the franchisee and any specific requirements were minimal. For example, Dairy Queen required the franchisee to hire "efficient, competent, sober employees who must work in uniforms approved by the company." *Id*. at 922. Other generalized requirements included stores constructed in accordance with plans furnished or approved by the company and "substantial uniformity" in the store, *Id*. The only specific requirements, noted by the *Dairy Queen* court, were that the franchisee must use a Dairy Queen freezer and must remain open for business at least 335 days per year. *Id*. Other evidence presented in *Dairy Queen* indicated that the company did not participate in any profits earned by the franchisee. Instead, Diary Queen earned direct profits (as opposed to the benefits derived from goodwill) by selling ice cream mix to the franchisee. *Id*. In contrast, King paid Huddle House a weekly

10

fee equal to four percent of the franchise's gross volume. (Def.'s Ex. B at pg. 4, ¶ b.) Furthermore, unlike Dairy Queen, Huddle House appears to exercise control over day-to-day procedures such as food preparation, cooking, serving, maintenance and cleaning procedures. (Def.'s Ex. B. at pg., 11 ¶ k.) Thus *Dairy Queen* does not necessitate a summary judgment finding in favor of Huddle House.

Although the franchisor in *Wood v. Shell Oil Co.* exercised more control than the franchisor in *Dairy Queen*, the Alabama Supreme Court still held that no agency relationship existed in *Shell*. 495 So. 2d at 1034. The facts in *Shell* which parallel the present case are numerous. First, Shell required that its franchisee remain open twenty four hours per day. *Id*. at 1036. Second, Shell had final approval on proposed alterations of the premises, store layout and design. *Id*. at 1036 - 37. Similarly, the franchisee was obligated to maintain the premises and conduct repairs in accordance with Shell's specifications. *Id*. at 1037. Third, Shell required that the franchisee's employees "wear clean uniforms of a type and style approved" by the company. *Id*. Finally, Shell maintained the right to inspect the premises and terminate the franchise agreement for non-compliance. *Id*.

However, what is most compelling about *Shell* is that the

11

facts of the case offer some striking differences from the present case. The *Shell* franchisee was free to purchase and sell both its primary product, fuel, and ancillary products from other companies. *Id.* at 1036. In the present case, however, Huddle House may dictate the products, goods or services the franchisee offers. (Def.'s Ex. B at pg. 12, ¶ (p)(iii).) In *Shell* the franchisee was under no obligation to accept advertising from the company. In contrast, Huddle House does exercise a degree of control over advertising, beyond implementation of general standards. Specifically, the franchisee must contribute to a Huddle House advertising fund. (Def.'s Ex. B at pg. 5, ¶ h.) Furthermore, the franchisee must obtain approval to undertake advertising that diverges from company approved formats and any approved advertising becomes the property of Huddle House, which may allow other franchisees to use the same advertising without compensating the franchisee who sought approval. (Def.'s Ex. B at pg. 17, ¶ a.) While Shell franchisees maintain the exclusive authority to hire and fire their employees, Huddle House specifies that its franchisees must fire managers who are affiliated with certain prohibited types of restaurants. *See id.* at pg. 16, ¶ aa. Moreover, Huddle House mandates the particulars of the termination. The franchisee must give the manager written notice to discontinue the prohibited affiliation and terminate the manager if there is no compliance within thirty days. *Id.*

Finally, there is no evidence that Shell controlled the daily activities of its franchisees. Huddle House, on the other hand, reserves the right to require "strict" conformance with its cooking, food preparation, serving, maintenance and cleaning methods. *Id.* at pg. 11, ¶ k. Given these striking differences, the court finds that it is not bound by the result in *Shell*.

## V. CONCLUSION

In light of the apparent control Huddle House has reserved over the day-to-day activities of King, the court determines that genuine issues of material fact exist regarding whether the two entities maintained a principal - agent relationship. Consequently, summary judgment for Huddle House is not appropriate.

A separate appropriate order will be entered.

DONE this 21st day of July, 1998.

_____
WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE